**Sammy Ray BENNETT, Petitioner,**

v.

**Honorable Joe D. SHUMATE, District Judge, McClain County and/or The State of Oklahoma, Respondent,**

and

**The Attorney General of the State of Oklahoma, Additional Respondent.**

No. CIV–79–119–D.

United States District Court,
W. D. Oklahoma.

March 10, 1979.

David M. Jordan, Moore, Okl., for petitioner.

Jan Eric Cartwright, Atty. Gen. by David W. Lee, Asst. Atty. Gen., Oklahoma City, Okl., for respondents.

## OPINION AND ORDER

DAUGHERTY, District Judge.

The petitioner has filed a "Petition for a Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. 2254" and the only ground averred is that the Double Jeopardy Clause of the Fifth Amendment bars his retrial for the crime of Murder in the First Degree in the District Court of McClain County, Oklahoma. The respondents, Honorable Joe D. Shumate, District Judge McClain County, Oklahoma and the Attorney General of the State of Oklahoma, have answered and alleged that this proceeding is premature in view of a failure to exhaust state remedies, or, alternatively, that this proceeding should be dismissed on the merits. Also, petitioner's "Traverse" has been filed as well as the Transcript of Trial and Trial Record of the state proceedings. On March 6, 1979, petitioner filed an Application to Stay his retrial currently docketed for March 19, 1979, to protect the constitutional rights he has asserted herein.

On December 7, 1977, petitioner was tried by jury for the offense of Murder in the First Degree in the District Court of McClain County, Oklahoma. The record reflects that the jury " . . . retired for deliberations at 11:05 a. m., Wednesday, December 14, 1978 [sic] 1977." (Tr. at 2). At 3:45 p. m. on said date, the jury was brought back into the courtroom at their request for a conference regarding the testimony of certain witnesses. After the witness' testimony was read, the jury again retired to deliberate at 4:50 p. m. At 9:00 p. m. the jury was brought back into the courtroom where they revealed their numerical standing as seven, three, and two and then retired for the night. On December 15, 1977 the jury resumed deliberations at 8:30 a. m., were returned to the courtroom for the reading of additional testimony at 10:30 a. m., whereupon they retired for further deliberations at 10:50 a. m. At 2:05 p. m. the jury informed the court of their numerical standing of 11 to one and the court inquired regarding the number of ballots and time said ballots were taken, and instructed them regarding further deliberations (Tr. at 4–7). At 4:15 p. m. the jury returned to the courtroom and advised the court of their numerical standing of 11 to one, whereupon the court again inquired regarding the number of ballots and the time they were taken, and was advised by the foreman that the jury was hopelessly deadlocked. The court polled the jury as to further deliberations and at the conclusion of the polling summarized the proceedings as follows (Tr. at 21–22):

"By the Court:

We seem to have a situation here where, I don't know whether it's half and half, but I would say it's probably pretty close to that, maybe five and seven, some of you feeling it is hopelessly deadlocked and others say that with a little more deliberation there is a possibility, and they indicate that they would like to try further. Let's see the hands of those who feel that way, that with further deliberation they would think that you possibly might arrive at a verdict and would like to try that? Well, that's about half of you. Well, all right then, Ladies and Gentlemen of the Jury, as I have stated, the court certainly does not intend to ask anyone to compromise or violate their own conscious; but we all know that with deliberation, discussions, and applying reason and not force that sometimes we do change our minds; so I'll let you return to your jury room now. It's 4:30 and I'm going to leave the next move up to the jury. If you want to go to supper, say, around six or thereabouts, let the bailiffs know. If you come to some con-

clusion, just send word to the court and we'll bring you in and discuss the matter further.

(Whereupon, the jury retired for further deliberation, and were brought back into the court room and seated in their chairs at 6:30 P.M., and the following proceedings were had:)"

At 6:30 p. m. upon the jury's return to the courtroom and report of their numerical standing of 11 to one, the court again polled the jury as to further deliberations and the proceeding was concluded as follows (Tr. at 30–33):

"By the Court:

Is it your individual opinions now and the consensus of the jury as a group that this jury is now hopelessly deadlocked in their decision in this case; and that you would not be able to arrive at a verdict, regardless of how long you might be kept? Is that right?

(Whereupon, there was assent in unison).

By the Court:

You have had the case about 30 hours. You have slept with it. You have had it on your mind, I know, all of this time; and you have discussed it; and you now tell the court that you feel then that you have exhausted all possibilities of arriving at a verdict? Is that correct?

(Whereupon, there was assent in unison).

By the Court:

Ladies and Gentlemen of the jury, let me ask one other question: Do you feel that if we, say, if we retired now and you went back to the motel and rested and relaxed some, and then came back in the morning when your minds are more fresh and you bodies are rested that there would [be] a possibility then of coming to a decision in the case, arriving at a verdict?

(Members of the jury at this point nodded their heads negatively).

By the Court:

Do any one of you think that that would accomplish a verdict?

By Juror Thompson:

No, sir.

By the Court:

Are you agreeing and saying that it would not? If so, hold up your hands. Mrs. Faith, you seem to be the only one that isn't holding up your hand.

By Juror Faith:

I honestly couldn't answer that.

By the Court:

Right now you don't think you could arrive at a verdict?

By Juror Faith:

No.

By the Court:

What you are saying is that all things are still possible?

By Juror Faith:

Right now at this point I don't think it's possible, but I can't say a good night's rest might change things.

By the Court:

Of course, the final determination of when to stop a matter like this is with the court. The court is of the opinion that we have a very conscientious, hard working jury. I feel that you have given of your utmost in your deliberation of the case, you have been most attentive, you have been a very fine jury. If I thought there was some possibility of going on, I would do so; however, I am now of the opinion that this jury is hopelessly deadlocked. I do not feel that I should keep a jury in a position where they might feel the court is using any type of force or coercion upon them to change their mind, that's not the purpose of it. The court is now convinced and is of the opinion that this jury has exhausted all possible avenues of arriving at a verdict after having it for some 30 hours; so the court will accept the statements and the poll of the jury that the case is hopelessly deadlocked; and the court will now declare this case to be hopelessly deadlocked and a mistrial is declared in the trial.

Now, Ladies and Gentlemen of the Jury, of course there will be nothing further to present to you in this case, so you will be discharged from any further con-

sideration of this case. I want to again thank you for the attention and for your cooperative attitude in the matter, and you will now be excused from attendance; and if you will, just remain right there until I declare a recess. The court has declared a mistrial in the case and the case will be set for trial on the next regular docket of the court.

(The jury left the court room, after which the following proceedings were had:)

By Mr. Jordan:

Comes now the defendand [sic] and enters an objection to the ruling of the court on declaring a mistrial.

By the Court:

The objection will be shown upon the record and the court overrules the objection and allows an exception."

Petitioner was scheduled to be re-tried in April of 1978. Prior to the second trial, petitioner's Motion to Dismiss was overruled, but the case was continued to allow petitioner to obtain appellate review of the Double Jeopardy issue he had raised. On October 24, 1978, the Oklahoma Court of Criminal Appeals denied petitioner's contention that a second trial would subject petitioner to double jeopardy in violation of the Fifth Amendment to the United States Constitution. *Bennett v. Shumate*, 586 P.2d 333 (Okl.Cr.App.1978). On October 27, 1978, the case was again stricken from the trial court's docket and reset on March 19, 1979.

Upon review of this proceeding the court finds and concludes as follows:

■ 1. That the Exhaustion of Remedies Doctrine is not a bar to this action since the Double Jeopardy objection has been properly raised and available state court remedies exhausted. Title 28, U.S.C. § 2254(b), *Bennett v. Shumate*, supra.

■ 2. The matter of declaring a mistrial and discharging a jury is a "discretionary" matter when considered in the light of the double jeopardy standard governing the retrial of a defendant for the same offense. This was first said in *United States v. Per-ez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824):

"[I]n all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office."

■ Recently, however, the Supreme Court has had occasion to review a mistrial ruling by a state court in a federal habeas corpus proceeding where the double jeopardy issue was raised against a background analogous to the instant proceeding, i. e., that the trial judge did not expressly find that there was "manifest necessity" for a mistrial; nor did he expressly state that he had considered alternative solutions and concluded that none would be adequate. *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). In reviewing that proceeding the Court accorded the trial decision to declare a mistrial when he considered the jury deadlocked "great deference", and concluded as follows:

"One final matter requires consideration. The absence of an explicit finding of "manifest necessity" appears to have been determinative for the District Court and may have been so for the Court of Appeals. If those courts regarded that omission as critical, they required too

much. Since the record provides sufficient justification for the state court ruling, the failure to explain that ruling more completely does not render it constitutionally defective." Id., at 516–517, 98 S.Ct. at 836.

The court's review of the instant trial proceedings also clearly shows a searching, deliberate and concerned inquiry by the state trial judge which resulted in his exercise of sound discretion to declare a mistrial, absent an articulation in the record of the words "manifest necessity" or all the factors which inform the deliberate exercise of his discretion. Further, the court finds adequate support for the trial court's determination that the jury was hopelessly deadlocked upon application of the seven criteria stated in *Arnold v. McCarthy*, 566 F.2d 1377 (9th Cir. 1978):

> (1) a timely objection by defendant, (2) the jury's collective opinion that it cannot agree, (3) the length of the deliberations of the jury, (4) the length of the trial, (5) the complexity of the issues presented to the jury, (6) any proper communications which the judge has had with the jury, and (7) the effects of possible exhaustion and the impact which coercion of further deliberations might have on the verdict.

Cf., *United States v. Horn*, 583 F.2d 1124 (10th Cir. 1978). It follows that the state trial judge's mistrial declaration is not subject to collateral attack, that no jeopardy attached during December of 1977 and that the State of Oklahoma is not constitutionally barred from again trying the petitioner in the subject state court action.

Accordingly, it is hereby ordered this 10th day of March, 1979, that the Petition for Writ of Habeas Corpus be and hereby is dismissed, and, in view of the foregoing, the petitioner's Application for Stay is moot and is hereby stricken.